IN THE COURT OF CRIMINAL APPEALS


OF TEXAS






NOS. PD-0962-06 & PD-0964-06






KERRY LARNEZ ROLLERSON, Appellant



v.


 

THE STATE OF TEXAS





ON APPELLANT'S AND STATE'S


PETITIONS FOR DISCRETIONARY REVIEW


FROM THE SIXTH COURT OF APPEALS


LAMAR COUNTY





 Cochran, J., delivered the opinion of the Court, in which Keller, P.J., and
Meyers, Price, Johnson, Keasler, Hervey, and Holcomb, JJ., joined. Womack, J.,
dissented.


O P I N I O N 



 Floyd McCoin, James Hines, and Neil Norrell all had their homes burglarized. Guns
were stolen in the McCoin and Norrell burglaries, and gun parts were left behind in the Hines
burglary. Appellant was charged with committing all three burglaries. The trial judge, in a
consolidated trial, found him guilty of seven felony offenses relating to those three burglaries. 
He also entered deadly-weapon findings in each of the seven judgments.

 In three separate published opinions-each dealing with an individual burglary-the court
of appeals affirmed four of the felony convictions and reversed the other three for factual
insufficiency. (1) The court of appeals also found the evidence legally insufficient to support any
of the deadly-weapon findings, and so it deleted those findings from the four convictions it
affirmed. It also declared that the State could not, on retrial of any of the reversed counts, seek
a deadly-weapon finding. (2) 

 Appellant, seeking review of the Norrell case, questions whether the court of appeals
applied the correct legal and factual sufficiency standards when it affirmed his theft of a
firearm and felon in possession of a firearm convictions. (3)

 The State Prosecuting Attorney, seeking review of the Hines case, questions whether
the court of appeals correctly held that it could not again seek an affirmative deadly-weapon
finding on the retrial of the reversed burglary count. (4)

 We hold that the court of appeals correctly affirmed the convictions in the Norrell case,
but was mistaken in its deadly-weapon statement in the Hines case. We thus 1) affirm the
Norrell case, but 2) disavow the court's statement in the Hines case that the State may not seek
a deadly-weapon finding on the retrial of the burglary charge.

I.
 

 In the summer of 2003, three separate houses in Lamar County-all on the outskirts of
Paris, Texas-were burglarized on three consecutive days. 

 Floyd McCoin's house was burglarized first. On July 15th, Mr. McCoin, who had left
home after eating lunch, came back with his grandson around 2:00 p.m. to find that his house
had been burglarized and ransacked. The television was gone, and so were several other
items-jewelry, a telephone, coins, and something that Mr. McCoin considered an heirloom,
"a Belgian made gun that had German swastikas on it" that he had taken from "a German
prisoner in World War II."

 James Hines's house was burglarized the next day. Mr. Hines left his home in the
morning to fix a flat tire at a gas station. When he returned, he noticed that his dog was out and
his back door open. He knew something was amiss, and he quickly realized that he had been
burglarized and his house ransacked. "The drawers on everything was pulled out, it was dumped
on the beds. The TV was gone. My binoculars on the icebox was gone. Metal boxes were
gone. The front bedroom, all of the dressers were ransacked. The ones in the back bedroom
were [also]." He called the police and when a detective arrived, they noticed a revolver
cylinder in the front bedroom and then found the cylinder pin for that revolver outside. Mr.
Hines did not own a revolver, but he noticed that the cylinder "had some shells in it." This
upset Mr. Hines because it meant that the burglar was armed when he entered and ransacked
the house.

 On July 17th, the day after the Hines's burglary, Neil Norrell's house was burglarized. 
Someone forced open his front door with a crowbar or large screwdriver and emptied his gun
cabinet of ten guns, including shotguns, rifles, semi-automatic pistols, and revolvers. The
burglar also stole his extensive collection of uncirculated coins.

 The three burglaries were quickly connected by Joe Tuttle, the lead detective. He noted
that the burglaries occurred on consecutive days; all three homes were "in the rural country,
off a country road"; all were burglarized in the daytime when no one was home; and similar
items were taken during each burglary.

 Police alerted local merchants to look out for uncirculated coins. On July 18th, the day
after the Norrell burglary, the owner of Pappy's Food Mart told police that "a black male and
a black female in a grayish-looking suburban" had just brought in some uncirculated coins (5) 
A few hours later, appellant and LaTonya Brigham were detained at Westside Checking after
they came in to cash in some brand new coins. Appellant had a small brown bank bag full of
uncirculated coins. Mr. Norrell's engraved briefcase was found in Ms. Brigham's car.

 Appellant's brother, Cory Rollerson, watched as his brother was arrested. When he
heard that appellant was being arrested on a burglary investigation involving guns and coins,
Cory went to his mother's house to collect some guns and jewelry-things he knew "didn't
belong in [his] mom's house"-that he had noticed in her home a couple of days before. Cory
piled four or five handguns, a jewelry box, and other items onto a bedspread, put the wrapped-up pile into his truck, and drove to a vacant house that his father had given him on Graham
Street. He backed the truck into the yard, took out the blanket with "the stuff" in it, and went
behind the barn to bury it. Watching neighbors, however, called the police who came before
Cory could bury all of "the stuff." Guns were all over the ground when the police arrived.

 Meanwhile, Detective Tuttle, learning that appellant sometimes stayed at his mother's
house, obtained her consent to search the house. "She said she was more than willing. She
didn't want no stolen stuff around her house." In the back room, where appellant's tennis shoes
were tucked by the end of the bed, police found 1) Mr. Hines's television and binoculars, and
2) an orange-handled long screwdriver, the width of which, said Detective Tuttle, matched the
pry marks on Mr. Norrell's front door. Appellant's right tennis shoe matched a shoe print
lifted from Mr. McCoin's house.

 Appellant was charged with 

 1) three counts in the McCoin break-in: burglary of a habitation, theft of a firearm,
and felon in possession of a firearm; 


 2) one count in the Hines break-in: burglary of a habitation; and 


 3) three counts in the Norrell break-in: burglary of a habitation, theft of a firearm,
and felon in possession of a firearm. 


After hearing the evidence, the trial judge found appellant guilty of all seven counts. He also
entered deadly-weapon findings on all counts. 

 On appeal, appellant challenged all of the convictions and deadly-weapon findings on
sufficiency grounds. He had some success. In the McCoin case, the court of appeals reversed
the burglary and theft convictions for factual insufficiency, but affirmed the conviction for
felon in possession of a firearm. (6) In the Hines case, the court of appeals reversed the burglary
conviction for factual insufficiency. (7) But in the Norrell case, the court affirmed all three
convictions. (8) The court of appeals also found the evidence legally insufficient to support any
of the deadly-weapon findings, so it deleted those findings from the four convictions it
affirmed. (9) It also declared that the State could not seek a deadly-weapon finding on retrial of
any of the reversed counts. We granted review on only two points, the sufficiency finding in
the Norrell case, and the court of appeals's statement, in the Hines case, that the State could
not again seek a deadly-weapon finding.

II.


The Norrell Burglary


A. Procedural history


 In the Norrell burglary, appellant was convicted of burglary of a habitation, theft of a
firearm, and felon in possession of a firearm. In affirming the legal and factual sufficiency of
the burglary conviction, the court of appeals relied on the rule that "a defendant's unexplained
possession of property recently stolen in a burglary permits an inference that the defendant is
the one who committed the burglary." (10) The court found that the evidence was sufficient to
prove, beyond a reasonable doubt, that appellant burglarized Mr. Norrell's home based on the
evidence of his personal, recent, and unexplained possession of Mr. Norrell's coins. Having
found the evidence sufficient to sustain appellant's conviction for burglary, the court held it
was also legally and factually sufficient to sustain his convictions for theft of a firearm
(because firearms were stolen in the Norrell burglary) and felon in possession of a firearm
(because appellant stipulated to his prior felony conviction and the evidence that appellant
burglarized Mr. Norrell's home and stole his guns "necessarily entail[ed] that Rollerson
possessed a firearm at one point." (11)).

 Appellant asked this Court to review the lower court's sufficiency analysis of all three
offenses. We granted review of two: the theft of a firearm and felon in possession of a
firearm. We agree, for the most part, with the court of appeals's analysis, and we agree fully
with its result.

B. The law

 In assessing the legal sufficiency of the evidence to support a criminal conviction under
Jackson v. Virginia, (12) we consider all of the evidence in the light most favorable to the verdict
and determine whether, based on that evidence and reasonable inferences therefrom, a rational
juror could have found the essential elements of the crime beyond a reasonable doubt. (13) But
"[e]vidence, that rationally supports a verdict of guilt beyond a reasonable doubt under the
Jackson v. Virginia legally sufficiency standard, can still be factually insufficient." (14) Evidence
is factually insufficient to support the verdict if it is clearly wrong or manifestly unjust or
against the great weight and preponderance of the evidence. (15) Both legal and factual
sufficiency standards require the reviewing court to consider all of the evidence. "The
difference between the two standards is that the former requires the reviewing court to defer
to the jury's credibility and weight determinations while the latter permits the reviewing court
to substitute its judgment for the jury's on these questions 'albeit to a very limited degree.'" (16)
In reality, a "factual-sufficiency review is 'barely distinguishable' from a Jackson v. Virginia
legal sufficiency review." (17)

C. The law applied

 Appellant's complaint is not with the court of appeals's application of the general legal
and factual standards of review set out above. Rather, appellant argues that the court of appeals
erroneously relied solely on the evidence of his possession of Mr. Norrell's stolen coins to
connect him to the other two offenses.

 Appellant acknowledges the well-settled rule that a defendant's unexplained possession
of property recently stolen in a burglary permits an inference that the defendant is the one who
committed the burglary. (18) We recently reaffirmed this rule in Poncio v. State. (19) There, we held
that the defendant's "exclusive and unexplained possession of property recently stolen in a
burglary in conjunction with the fact that he pawned the property very close to the burgled
home are sufficient to support his burglary of a habitation conviction." (20) Appellant also
acknowledges this Court's recent decision in Hooper v. State, (21) in which we noted that a
factfinder is entitled "to draw multiple reasonable inferences as long as each inference is
supported by the evidence presented at trial." (22) 

 Appellant argues that, in this case, the court of appeals misapplied the rules set out in
Poncio and Hooper by using the inference permitted by his possession of Mr. Norrell's stolen
coins to sustain his convictions for the theft of Mr. Norrell's firearms and as a felon in
possession of those firearms. Specifically, he faults the court of appeals for reasoning that,
because his personal and unexplained possession of the coins was legally and factually
sufficient evidence to sustain his conviction for burglary, that same evidence sufficed to
support his convictions for theft of a firearm and felon in possession of a firearm.

 Appellant asserts that these inferences break down because, even assuming that he is
guilty of the Norrell burglary because he personally possessed some of Mr. Norrell's coins
the day after they were stolen, there is no evidence that he acted alone. Thus, goes the
argument, there is no direct or inferential evidence that he was personally in Mr. Norrell's
house or personally possessed any of the firearms. Rather, he claims, the evidence suggested
others might have been involved-his brother Cory, Rodaniel Sims, or Veronica West.
Appellant's point is that, even if he is criminally responsible as a party to the burglary, it could
have been Cory, Rodaniel, or Veronica who actually entered the Norrell home and stole the
guns. (23) Thus, he may never have "possessed" them.

 We note that there is no affirmative evidence that any particular person entered Mr.
Norrell's home. We also note that Cory gathered up a bedspread-full of guns, jewelry, and
other items gathered from the back room at his mother's house-a room that appellant
sometimes stayed in. One of the items Cory attempted to bury was a pistol stolen from Mr.
Norrell's home. When detectives searched the back room, they found a screwdriver whose
width matched the width of the burglary pry-marks on Mr. Norrell's front door. Additionally,
when appellant was arrested, Mr. Norrell's briefcase was in the car in which he had been a
passenger. Finally, a virtual stockpile of the goods stolen from all three burglarized homes was
found either with appellant, his brother's bedspread "stuff," or in back room of his mother's
house. (24) It is a fair inference from the evidence that appellant personally possessed the vast
majority of the stolen items, that he was, if not the sole burglar, at least the leader of the pack
of burglars. Thus, the evidence supporting all three convictions-burglary, theft of a firearm,
and felon in possession of a firearm-is not limited to appellant's possession of Mr. Norrell's
coins.

 The State argues that, under Poncio, the trial judge, as factfinder, was authorized to find
that appellant entered Mr. Norrell's home and committed the burglary. The State also asserts
that "if the factfinder is permitted to draw a reasonable inference that an individual entered
certain premises and committed a burglary, the factfinder is also permitted to draw a
reasonable inference that the individual stole any and all property taken during the burglary." 
We agree, but with a caveat. The inference permitted, in such a situation, is that the individual
is criminally responsible, at least as a party, for all property stolen during the burglary. A
person may be convicted as a party to an offense if that person commits the offense by his or
her own conduct or by the conduct of another for whom he or she is criminally responsible. (25) 
Thus, whether the defendant actually entered the home is not determinative of whether he is
responsible for all items stolen in the burglary. (26) 

 Even if appellant was only a "lookout" (or one of several burglars) he is still guilty of
the offense of burglary. All participants in a burglary are criminally responsible for all items
stolen under the law of parties, regardless of whether they are caught red-handed with each and
every individual item. (27) 

 Here, then, the court of appeals properly held that the totality of evidence, including
appellant's personal possession of Mr. Norrell's stolen coins and the fact that appellant's
brother Cory attempted to bury one of Mr. Norrell's handguns that Cory found in the back
room in his mother's home, was legally and factually sufficient to sustain his conviction for
stealing Mr. Norrell's handgun during that same burglary. At a minimum, appellant was
responsible as party to that theft, and that is all that the law requires. (28) 

 We disagree, however, with the court of appeals that it necessarily follows that
appellant "possessed a firearm at one point." In theory, it might be possible that appellant
never actually touched Mr. Norrell's handgun. If other persons in fact participated in the
burglary of Mr. Norrell's home, it is possible that they, rather than appellant, handled the guns
and carried Mr. Norrell's handgun to appellant's mother's home and deposited it in appellant's
room. 

 But appellant's possible party liability to the theft of the firearm cannot sustain his
conviction for felon in possession of a firearm, absent evidence that he knew of the existence
of the firearm and exercised control over it. (29)
 While there is no affirmative evidence that
appellant physically placed the guns in the back room of his mother's house, there is no
affirmative evidence that any of the other possible suspects did either. And those guns were
in appellant's mother's house, not the home of any other possible suspect. Though appellant
focuses on the fact that his brother was found in physical possession of the stolen guns, Cory
testified the guns were not his and that he was just trying to keep appellant out of trouble by
hiding them. The trial judge was entitled to believe Cory as well as Detective Tuttle, who stated
he did not think Cory was otherwise involved in the burglary. 

 In sum, the State's case did not rely upon multiple inferences drawn from the single fact
that appellant possessed Mr. Norrell's stolen coins. Rather, the record shows that the State
offered substantial circumstantial evidence that affirmatively linked appellant to the stolen
guns and was sufficient to support a finding that appellant knew of the existence of the firearms
stolen from Mr. Norrell and that he exercised control over at least one of them.

 In many respects, this case is like O'Fallin v. State, (30) in which this Court rejected the
defendant's argument that because the evidence did not show that "the goods taken from the
burglarized house found in appellant's father's residence were exclusively in appellant's
possession," the evidence was insufficient to prove he was the person who burglarized the
victim's house. (31) The defendant in O'Fallin was in exclusive possession of a shirt taken from
the Cozart's storehouse; the Cozart brothers caught him wearing it. (32) But other circumstantial
evidence also tied the defendant to the stolen goods found in his father's house. First, he left
town on a train when he heard that officers were going to search his father's house. When the
train stopped, a constable boarded and told the defendant that he was hunting for him. The
defendant denied his name and gave another name. When he finally realized that he would be
arrested for the burglary, he told the constable that he was not the burglar, it was his brother. (33) 
But the defendant's brother testified "that he had nothing to do with the burglary or stolen
goods and knew nothing about them, and was not aware of the fact they were in the house where
found." (34) Further, the defendant's father "testified that he knew nothing of the goods, or how
they got into his house, that they were put in the house without his knowledge or consent." (35) 
In assessing the evidence, this Court concluded that the rule of exclusive possession of
recently stolen property is not always the sole criterion for sufficiency of the evidence. The
evidence is sufficient

 if the facts and circumstances show that appellant was the guilty party to the
exclusion of the reasonable doubt. Each case must depend upon its own facts
connecting the party with the crime charged. If the State relies only upon the
fact of possession, then it must be exclusive and unexplained. He may be
convicted as well upon circumstantial evidence . . . and we are of the opinion that
the evidence is sufficient to show that he was the party who entered the house. 
In fact, if he had been charged with theft of the goods, we are of the opinion this
evidence would have sustained the conviction for that offense. (36)

Much of the O'Fallin reasoning applies here. Although the court of appeals seemingly
reasoned that appellant's personal possession of Mr. Norrell's coins was "the" criterion, the
trial judge also heard significant other circumstantial evidence that proved, beyond a
reasonable doubt, that appellant "possessed" Mr. Norrell's handgun and hence was guilty of
both the theft of that firearm and of being a felon in possession of a firearm. We therefore
affirm the judgment of the court of appeals holding that the evidence is legally and factually
sufficient for all three convictions concerning the Norrell break-in.

III.


The Hines Burglary


A. Procedural history


 In the Hines burglary, appellant was convicted for burglary of a habitation. The trial
court entered an affirmative deadly-weapon finding. On direct appeal the court of appeals
found the evidence factually insufficient to support the burglary conviction and remanded the
case for a new trial. It also found that the State's evidence was legally insufficient to support
the trial court's finding that appellant "used" or "exhibited" a deadly weapon during that
burglary. Finally, it stated that the "State is not permitted, on retrial, to seek a deadly weapon
finding." 

 The State Prosecuting Attorney filed a petition for discretionary review challenging the
statement that it could not, on retrial, seek a deadly-weapon finding. The question presented
is: Does the failure of the State to produce sufficient evidence to support an affirmative
finding of the use or exhibition of a deadly weapon prevent the state from again seeking such
an affirmative finding on retrial after an appellate reversal of conviction? 

 The State asserts that such relitigation is not barred because double jeopardy does not
apply to sentencing proceedings of a trial for a non-capital offense. Appellant concedes this
particular point, but argues that it is not dispositive of the question involved in this case. 
Appellant states that, "while pure Double Jeopardy principles may permit the State to seek a
deadly weapon finding the second time around, principles of collateral estoppel do not." We
find that, under the circumstances of this case, neither double jeopardy nor collateral estoppel
bars the re-litigation of the deadly-weapon issue. 

B. The law

 The Fifth Amendment provides that no person shall "be subject for the same offence
to be twice put in jeopardy of life or limb." (37) It is "well established that the Double Jeopardy
Clause forbids the retrial of a defendant who has been acquitted of the crime charged." (38) The
Supreme Court, however, "has resisted attempts to extend that principle to sentencing." (39) This
is because "[t]he imposition of a particular sentence usually is not regarded as an 'acquittal' of
any more severe sentence that could have been imposed." (40) Generally, the Double Jeopardy
Clause does not impose "any absolute prohibition against the imposition of a harsher sentence
at retrial after a defendant has succeeded in having his original conviction set aside." (41)

 But in Ashe v. Swenson, (42) the Supreme Court recognized that the Fifth Amendment
guarantee against double jeopardy also embodies the principle of collateral estoppel as a
constitutional requirement. (43) The Court stated that "whatever else that constitutional guarantee
may embrace, it surely protects a man who has been acquitted from having to 'run the gauntlet'
a second time." (44) The term "'[c]ollateral estoppel' is an awkward phrase, but it stands for an
extremely important principle[;] . . . when an issue of ultimate fact has once been determined
by a valid and final judgment, that issue cannot again be litigated between the same parties in
any future lawsuit." (45) Thus, under the collateral-estoppel component of double jeopardy, the
government may not litigate a specific elemental fact to a competent factfinder (judge or jury),
receive an adverse finding by that factfinder on the specific fact, learn from its mistakes, hone
its prosecutorial performance, and relitigate that same factual element that the original
factfinder had already decided against the government. (46) With these general principles in mind,
we turn to the Hines case.

C. The law applied

 Again, appellant concedes that relitigation of the deadly-weapon issue is not barred by
double jeopardy because double jeopardy does not apply to sentencing proceedings of a trial
for a non-capital offense. (47) Appellant argues that relitigation is barred only by principles of
collateral estoppel. (48) The State responds that those principles do not apply here because the
deadly-weapon finding is "not an ultimate issue of fact." (49) We disagree. The use of a deadly
weapon can be "an ultimate issue," subject to the principles of collateral estoppel. If a
factfinder determines a defendant did not use a deadly weapon, the State cannot contest the
jury's finding of that fact in a subsequent proceeding.

 Nevertheless, we find that collateral estoppel does not apply in the present situation. 
 As we noted in Ex parte Watkins, "[b]efore collateral estoppel will apply to bar re-litigation
of a discrete fact, that fact must necessarily have been decided in favor of the defendant in the
first trial." (50) The key to collateral estoppel is that the original factfinder, whether judge or
jury, has necessarily determined an essential fact. 

 Under this constitutionally based doctrine of collateral estoppel, "when an issue
of ultimate fact has once been determined by a valid and final judgment, that
issue cannot again be litigated between the same parties in any future lawsuit." 
That is, once a jury determines a discrete fact in favor of a criminal defendant,
the State cannot contest the jury's finding in a subsequent proceeding. In
applying the doctrine of collateral estoppel, courts must first determine whether
the jury determined a specific fact, and if so, how broad-in terms of time, space
and content-was the scope of its finding. Before collateral estoppel will apply
to bar relitigation of a discrete fact, that fact must necessarily have been
decided in favor of the defendant in the first trial. (51)

 In this case, the factfinder found against appellant. The trial judge explicitly found that
appellant did use a deadly weapon during the commission of the Hines burglary. It does not
matter, for purposes of collateral estoppel, that the court of appeals found the evidence legally
insufficient to support the original factfinder's determination. The court of appeals was not
the original factfinder. The principle of collateral estoppel gives deference to "efficiency,
fairness, and truth determination" (52) by the original factfinder, not a reviewing court. (53) Thus,
had the trial judge found against the State on the deadly-weapon issue, we would agree that the
State could not relitigate the deadly-weapon issue in the retrial of the burglary case. The cases
reflect this principle. (54)

 As appellant points out, in Santamaria v. Horsley, (55) a panel of the Ninth Circuit held
that when a jury found the appellant guilty of murder and robbery, but the original jury found
a sentence-enhancement charge that he personally used a deadly weapon "not true," collateral
estoppel prevented the State, in the retrial of the case, from relitigating the weapon
enhancement. (56) But Santamaria simply demonstrates that collateral estoppel applies to those
specific facts that the original factfinder found "not true," not to those facts that the original
facfinder found "true" but that an appellate court deems unsupported by sufficient evidence.

 Appellant has not cited, and we are unable to find, any case from any jurisdiction in
which the doctrine of collateral estoppel has been applied when the original factfinder found
a fact to be true, but a reviewing court found the evidence insufficient to support that fact. (57)

Such a rule is antithetical to the principles of collateral estoppel which are intended to prevent
only the relitigation of an original factfinder's finding on specific, elemental facts. We hold
that the neither double jeopardy nor collateral estoppel bars the State from seeking a deadly
weapon finding in any retrial of the Hines burglary, because the original factfinder found for,
not against, the deadly-weapon finding.

IV.

 We therefore affirm appellant's convictions for "theft of a firearm" and "felon in
possession of a firearm" in the Norrell case (No. PD-0962-06), but disavow the court of
appeals's statement that the State cannot relitigate the deadly-weapon issue in the Hines case
(No. PD-0964-06).

Delivered: June 27, 2007

Publish 





 
1. Rollerson v. State, 196 S.W.3d 810 (Tex. App.-Texarkana 2006); Rollerson v. State,
196 S.W.3d 818 (Tex. App.-Texarkana 2006); Rollerson v. State, 196 S.W.3d 803 (Tex.
App.-Texarkana 2006). These will be referred to as the McCoin, Hines and Norrell cases for ease of
reference.
2. Rollerson (McCoin), 196 S.W.3d at 817 ("The State is not permitted, on retrial, to seek a
deadly weapon finding."); Rollerson (Hines), 196 S.W.3d at 823 (same).
3. Appellant's petition contends that the court of appeals "incorrectly applied legal and factual
sufficiency standard[s] when affirming appellant's conviction for felon in possession of a firearm [and
his] conviction for theft of a firearm."
4. The State Prosecuting Attorney's petition asks: "Does the failure of the state to produce
sufficient evidence to support an affirmative finding of the use or exhibition of a deadly weapon prevent
the state from again seeking such an affirmative finding on retrial after an appellate reversal of the
conviction?"
5. The suburban belonged to a friend of appellant's, Rodaniel Sims. 
6. Rollerson (McCoin) 196 S.W. 3d at 817.
7. Rollerson (Hines) 196 S.W. 3d at 823.
8. Rollerson (Norrell) 196 S.W. 3d at 805.
9. In the Norrell case, the court noted that there "is no evidence in the record that Rollerson
carried a firearm into Norrell's home during the burglary" and "the trial court appears to have based its
findings solely on Rollerson's possession of the firearms stolen during the burglary." 196 S.W.3d at
808. The court reversed the finding on the felon-in-possession count because "where the associated
felony is unlawful possession of a firearm by a felon, an affirmative deadly weapon finding cannot be
based solely on the defendant's possession of the firearm." Id. at 809 (citing Narron v. State, 835
S.W.2d 642 (Tex. Crim. App. 1992); Ex parte Petty, 833 S.W.2d 145 (Tex. Crim. App. 1992)).
And the court reversed the affirmative findings on the burglary and theft convictions because there was
no evidence that the stolen firearms were 'used' in furtherance of any collateral felony. Id. at 810 
(citing Patterson v. State, 769 S.W.2d 938 (Tex. Crim. App. 1989)). In the McCoin case, the court
reversed the finding on the felon-in-possession count for the same reason it did in the Norrell case. 196
S.W.3d at 816 ("where the associated felony is unlawful possession of a firearm by a felon, an
affirmative deadly weapon finding cannot be based solely on the defendant's possession of the
firearm").
10. Poncio v. State, 185 S.W.3d 904, 905 (Tex. Crim. App. 2006).
11. Rollerson v. State (Norrell), 196 S.W.3d at 808.
12. 443 U.S. 307, 318-19 (1979).
13. Hooper v. State, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007) (citing Jackson, 443 U.S. at
318-19). 
14. Marshall v. State, 210 S.W.3d 618, 625 (Tex. Crim. App. 2006) (footnote omitted). 
15. Id. at 625.
16. Id. (quoting Watson v. State, 204 S.W.3d 404, 416-17 (Tex.Crim.App. 2006)).
17. Id. (quoting Watson, 204 S.W.3d at 415).
18. See, e.g., Espinoza v. State, 463 S.W.2d 8, 10 (Tex. Crim. App. 1971) ("Possession of
recently stolen property, from a building which was left closed, is sufficient to support the conviction for
burglary with intent to commit theft."); Sullivan v. State, 433 S.W.2d 904, 905 (Tex. Crim. App.
1968) ("proof that a burglary was committed and appellant's unexplained possession of property stolen
from the building was sufficient to sustain the conviction"); Rodriguez v. State, 417 S.W.2d 165, 167
(Tex. Crim. App. 1967) ("The proof of appellant's unexplained possession of the recently stolen
property, taken from the building, was sufficient to sustain his conviction for the burglary."); compare
Dove v. State, 402 S.W.2d 913, 915 (Tex. Crim. App. 1966) (defendant's unexplained possession of
recently stolen property in apartment that he shared with someone whom jury could have concluded
was physically incapable of committing the offense sufficient to support burglary conviction), with
Prather v. State, 128 Tex. Crim. 342, 343, 81 S.W.2d 528, 529 (1935) (when recently stolen
property was found in a room shared by defendant and a woman, that evidence was insufficient,
standing alone, to support robbery conviction; stating, "Mr. Burrill on Circumstantial Evidence states
the rule as follows: 'A finding of stolen property in the prisoner's house or apartment is equally
competent in evidence against him as a finding upon his person. But the house or room must be proved
to be in his exclusive occupation. But if it were found lying in a house or room in which he lived jointly
with others equally capable of having committed the theft, it is clear that no definite presumption of guilt
could be made.'").
19. 185 S.W.3d 904 (Tex. Crim. App. 2006). 
20. Id. at 905.
21. 214 S.W.3d 9 (Tex. Crim. App. 2007).
22. Hooper, 214 S.W.3d at 15.
23. The lead detective testified that he did not think that appellant acted alone. He also noted
that some stolen jewelry was recovered at Rodaniel and Veronica's house, that those two had sold
some of the stolen coins, and that neither had been "cleared." Cory, by his own words and in
Detective Tuttle's opinion, was not involved beyond trying to protect appellant by absconding with "the
stuff" and attempting to bury it.
24. See Hardage v. State, 552 S.W.2d 837, 840 (Tex. Crim. App. 1977) ("In the instant case,
six of the eight items found in appellant's possession were positively identified as having been taken in
the burglary. A seventh item, a boy's eye glasses, was extremely altered, but nevertheless identified as
looking like the glasses taken in the burglary. While any one or two of the items could have readily
passed from one person to another, it is not as likely that the combination of the seven items herein
would pass in that combination from the burglar to another person.").
25. Tex. Penal Code § 7.02 ("Criminal Responsibility for Conduct of Another").
26. The parties here disagree on whether Poncio permits an inference of actual entry.
27. See Tex. Penal Code § 7.01(c) ("All traditional distinctions between accomplices and
principals are abolished by this section"); see also Frias v. State, 376 S.W.2d 764, 764-65 (Tex.
Crim. App. 1964) (testimony showed that defendant was a "lookout" for his burglary cohorts, did not
enter the liquor store, but did help load liquor bottles taken from the store into a car to transport and
sell it; evidence was sufficient to support defendant's conviction as a principal in the burglary); Guzman
v. State, 567 S.W.2d 188, 190 (Tex. Crim. App. 1978) (evidence sufficient to hold defendant
criminally responsible for burglary when his accomplice was seen coming out of victim's home with
various items, defendant was in her carport, screen door had been slit, defendant was found one hour
later with kitchen knife in his pocket, and both men fled from house together).
28. See Tex. Penal Code §§ 7.01(c) & 7.02, Frias, 376 S.W.2d at 764-65, Guzman, 567
S.W.2d at 190; see also Young v. State, 489 S.W.2d 289, 289-90 (Tex. Crim. App. 1973)
(evidence was sufficient to support finding that defendant was a principal to theft even though he acted
only as a look-out and distracted saleslady while his co-defendant took $80 coat).
29. See Young v. State, 752 S.W.2d 137, 140 (Tex. App.-Dallas 1988, pet. ref'd). 
"Possession" for purposes of this offense is generally analyzed under the rules for possession of
controlled substances. Therefore, the State was required to prove that appellant knew of the firearm's
existence and that he exercised actual care, custody, control, or management over it. Id. 


30. 75 Tex. Crim. 47, 169 S.W. 897 (1914) (opinion on rehearing).
31. Id. at 48, 169 S.W. at 898
32. Id. at 50, 169 S.W. at 898.
33. Id. at 49, 169 S.W. at 898.
34. Id. at 49, 169 S.W. at 898-99.
35. Id. at 49, 169 S.W. at 899.
36. Id. at 50, 169 S.W. at 899.
37. U.S. Const. amend. 5.
38. Bullington v. Missouri, 451 U.S. 430, 437 (1981).
39. Id. at 438.
40. Id.
41. Id. In Bullington, the Supreme Court recognized a narrow exception for capital cases. If a
capital-sentencing procedure resembles a trial on the issue of guilt or innocence, specifically requiring
the jury to determine whether the prosecution has "proved its case," a sentence of life imprisonment at a
first trial means that the jury has already acquitted him of whatever was necessary to impose the death
sentence. Id. at 444.
42. 397 U.S. 436 (1970).
43. Id. at 445.
44. Id.
45. Id. at 443. In Ashe, the evidence showed that several bandits robbed six men playing poker.
Ashe was tried and acquitted for robbing one of them. The State then successfully tried him for robbing
another victim. Because the robbery of the second poker player was a separate crime, the Double
Jeopardy Clause did not bar the second trial. Id. at 437-40, 446. However, the Double Jeopardy
Clause contained a collateral estoppel element that barred relitigation of any ultimate fact necessarily
decided in an earlier trial. Id. at 442-43, 445. At both trials, the evidence "that an armed robbery had
occurred . . . was 'unassailable,'" id at 438, and the Supreme Court determined that the "single
rationally conceivable issue in dispute before the jury was whether [Ashe] had been one of the
robbers." Id. at 445. The State was therefore barred by the doctrine of collateral estoppel from trying
Ashe for the robbery of any of the other poker players, because identity would be an ultimate issue in
each such trial and Ashe had already been acquitted of being one of the robbers.
46. Ashe, 397 U.S. at 447.
47. See Monge v. California, 524 U.S. 721, 729-30 (1998) (stating that the double-jeopardy
clause "neither prevents the prosecution from seeking review of a sentence nor restricts the length of a
sentence imposed upon retrial after a defendant's successful appeal"); see also Bell v. State, 994
S.W.2d 173, 175 (Tex. Crim. App. 1999) (following Monge and holding that federal double-jeopardy
principles do not bar the State from a second opportunity to present its proof of a prior conviction for
purposes of seeking a cumulated sentence).
48. In fact, appellant surely means "direct estoppel," not "collateral estoppel," because the State
wishes to relitigate the very same deadly-weapon finding that it originally obtained in the first trial when
it reprosecutes appellant for the very same criminal charge in a forthcoming second trial. See 18
Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice and
Procedure § 4418 (2d ed. 2002). But because criminal practitioners are accustomed to the term
"collateral estoppel" whenever addressing the question of issue preclusion, we will continue to use the
term "collateral estoppel."
49. State's Response to Appellant's Reply Brief at 2.
50. Ex parte Watkins, 73 S.W.3d 264, 268 (Tex. Crim. App. 2002) (citing De La Rosa v.
Lynaugh, 817 F.2d 259, 263 (5th Cir. 1987); United States v. Gonzalez, 548 F.2d 1185, 1191 (5th
Cir. 1977); Garcia v. Garza, 729 F. Supp. 553, 554 (S.D. Tex. 1989); State v. Nash, 817 S.W.2d
837, 840 (Tex. App.-Amarillo 1991, pet. ref'd)).
51. Ex parte Watkins, 73 S.W.3d at 268 (footnotes omitted, emphasis supplied).
52. Cynthia Randall, Comment, Acquittals in Jeopardy: Criminal Collateral Estoppel and
the Use of Acquitted Act Evidence, 141 U. Pa. L. Rev. 283, 290-91(1992).
53. See Notes: The Due Process Roots of Criminal Collateral Estoppel, 109 Harv. L. Rev.
1729, 1732-33 (1996), noting that the common-law doctrine of criminal collateral estoppel
incorporated several concerns:

 First, it reduced the chance that relitigation of an acquitted act could result in the
conviction of an innocent defendant. Second, it permitted an acquitted defendant to
rely on the finality of a prior adjudication. Third, it improved judicial economy by
barring relitigation of issues that had already been determined. Fourth, it reduced the
possibility of prosecutorial harassment and denied the prosecution the opportunity to
improve its case for a second trial. In recognizing these concerns, the doctrine
effectively gave added weight to acquittals: although an acquittal is not a finding that the
defendant is innocent but merely that he is not proven guilty, criminal collateral estoppel
barred the relitigation of acquitted acts, either in subsequent civil litigation or as
evidence of other acts in a subsequent prosecution. The common law seemed to reflect
a notion that a jury's verdict tainted acquitted-act evidence, such that it should not be
the basis of any subsequent proceeding. The doctrine also signaled that the government
has only one chance to litigate given facts against a defendant and cannot rely on
multiple chances to perfect its case.

Id.
54. See e.g., 35 Geo. L.J. Ann. Rev. Crim. Proc. 203, 447 n. 1450 (2006) (noting that courts
are reluctant "to allow collateral estoppel to prevent subsequent prosecution completely; instead, they
strictly analyze which issues were necessarily determined in the prior proceeding and preclude further
prosecution based only on those issues"); see, e.g., United States v. Gonzalez-Sanchez, 825 F.2d
572, 584 (1st Cir. 1987) (acquittal on charge of arson conspiracy barred subsequent prosecution for
involvement in the same conspiracy); United States v. Davis, 460 F.2d 792, 796 (4th Cir. 1972)
(acquittal that established conscientious-objector classification barred subsequent prosecution
challenging entitlement to such classification); De La Rosa v. Lynaugh, 817 F.2d 259, 268 (5th Cir.
1987) (voluntary manslaughter conviction barred relitigation of whether defendant acted with sudden
passion); United States v. Harvey, 900 F.2d 1253, 1257 (8th Cir. 1990) (prior determination of
immunity agreement barred relitigation of existence of agreement).
55. 110 F.3d 1352 (9th Cir. 1997).
56. 110 F.3d at 1355-56. The Ninth Circuit panel also held that the State could not, in the
retrial, even argue that Santamaria used a knife to commit the murder. Id. at 1356. But on rehearing,
the en banc court reversed this holding. Santamaria v. Horsley, 133 F.3d 1242, 1247-48 (9th Cir.
1998). The en banc court held that, while the jury determination on the weapons enhancement barred
the State from seeking the enhancement on retrial-because the ultimate fact of whether the State had
proven the weapon use beyond a reasonable doubt for the enhancement had already been determined
by the original jury-the use of a knife was not an ultimate fact for the retrial. Thus, the State could not
be precluded from presenting evidence that Santamaria stabbed the victim. "In this case, the State
failed to prove beyond a reasonable doubt the ultimate fact that Santamaria used a knife for the weapon
enhancement in the first trial. However, to convict him of murder under California law, the State is not
required to prove beyond a reasonable doubt that Santamaria used a knife. Therefore, the use of a
knife is not an ultimate fact for the retrial, and the State cannot be precluded from presenting evidence
that Santamaria stabbed the victim." Id. at 1247 (citation omitted).
57. See generally, 18 Wright, Graham & Cooper, supra, note 48, §§ 4416-4426.